UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CHO LEE LIN,                          :
                                      :    Civil Action No. 10-5502 (DMC)
              Petitioner,             :
                                      :
         v.                           :    **OPINION**
                                      :
GREG BARTKOWSKI, et al.,              :
                                      :
              Respondents.            :

**APPEARANCES:**

      CHO LEE LIN, <u>Pro Se</u> Petitioner
      SBI # 898775B
      New Jersey State Prison
      P.O. Box 861
      Trenton, New Jersey 08625

      VEROD ADONI, ESQ.
      BERGEN COUNTY PROSECUTOR'S OFFICE
      10 Main Street
      Hackensack, New Jersey 07601

**CAVANAUGH**, District Judge

    Petitioner Cho Lee Lin ("Petitioner"), a convicted state prisoner presently confined at the New Jersey State Prison in Trenton, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his New Jersey state court judgment of conviction entered on or about February 16, 1995.  For the reasons stated herein, the Petition will be denied for lack of substantive merit.

# I.   BACKGROUND

## A.   Procedural History

On June 1, 1994, a Bergen County Grand Jury indicted Petitioner and six co-defendants, Jeffrey Zhu, Xin Dan Lin, Chao Lin Feng, Yun Lin, Simon Lau and Sing Jun Jang, on numerous charges as follows: (Counts 1 through 5) capital murder; (Counts 6, 7, 8, and 9) murder of Ling Wang Guo, Yu Ping Zhang, Guang Sheng Li and Liang Qun Guo, respectively; (Counts 10, 11, 12, and 13) felony murder-kidnapping of Ling Wang Guo, Yu Ping Zhang, Guang Sheng Li and Liang Qun Guo, respectively; (Counts 14, 15, 16 and 17) felony murder-burglary Ling Wang Guo, Yu Ping Zhang, Guang Sheng Li and Liang Qun Guo, respectively; (Counts 18, 19, 20 and 21) felony murder-arson Ling Wang Guo, Yu Ping Zhang, Guang Sheng Li and Liang Qun Guo, respectively; (Count 22) attempted murder of Chang Liang Lin; (Count 23) attempted murder of Ah Mee Lui a/k/a Ming Cheng; (Count 24) kidnapping of Liang Qun Guo; (Count 25) kidnapping of Chang Liang Lin; (Count 26) burglary; (Count 27) attempted arson; (Counts 28 through 34) possession of various weapons for an unlawful purpose, including a .25 automatic, a .380 automatic, a "Mac 11," a .38 Smith and Wesson, a ".357 Mag," a "9 mm Lug," and knives and a saw; (Count 35) unlawful possession of a weapon, namely a "9 mm Mac 11;" (Count 36) possession of a defaced firearm - 25 Auto; (Count 37) possession of a defaced firearm - 9 mm Mac 11; and (Count 38)

possession of hollow point bullets.  (Respondents' Exhibit 1, Docket entry no. 12-1).

A trial was held before the Honorable William C. Meehan, J.S.C. and a jury on September 11, 1995.  Trial concluded on December 15, 1995, when the jury convicted Petitioner on (Counts 6 through 9) murder of Ling Wang Guo, Yu Ping Zhang, Guang Sheng Li and Liang Qun Guo, respectively; (Counts 13 through 17) felony murder-kidnapping of Liang Qun Guo and felony murder-burglary of Ling Wang Guo, Yu Ping Zhang, Guang Sheng Li and Liang Qun Guo, respectively; (Counts 22 and 23) attempted murder of Chang Liang Lin and Ah Mee Lui a/k/a Ming Cheng; (Counts 24 and 25) kidnapping of Liang Qun Guo and Chang Liang Lin; (Count 26) burglary; (Count 27) attempted arson; (Counts 28-33) 2nd degree possession of weapons, various firearms, for an unlawful purpose; (Count 34) 3rd degree possession of weapons, namely, knives and a saw, for an unlawful purpose; (Count 35) unlawful possession of a weapon - 9 mm Mac 11; (Count 37) possession of a defaced firearm - 9 mm Mac 11; and (Count 38) possession of hollow point bullets. Counts 1 through 5 charging capital murder were dismissed. Petitioner was acquitted of the remaining charges, Counts 10-12, 18-21, and 36.  (Petition at ¶ 5).

On February 16, 1996, Judge Meehan sentenced Petitioner to an aggregated sentence of four consecutive terms of life

imprisonment with 140 years of parole ineligibility. (Pet. at ¶ 3).

Petitioner filed a Notice of Appeal with the Superior Court of New Jersey, Appellate Division. (Pet. at ¶¶ 8, 9). On April 5, 1999, the Appellate Division affirmed the conviction and aggregate sentence, but remanded the matter for appropriate mergers. (Respondents' Exhibit 3 - April 5, 1999 Appellate Division Opinion).

On February 29, 2000, the Supreme Court of New Jersey granted certification limited solely to the issues arising out of courtroom security measures used during Petitioner's trial. State v. Lin, 163 N.J. 78 (2000). On October 23, 2000, the Supreme Court of New Jersey affirmed the Appellate Division's decision. State v. Zhu, et al., 165 N.J. 544 (2000).

In November 2000, Petitioner promptly filed a petition for postconviction relief ("PCR") in state court, which was denied without an evidentiary hearing by Judge Meehan on December 9, 2005.[1] (Pet. at ¶¶ 10, 11(a)). Petitioner field an appeal with the Appellate Division. (Pet. at ¶ 11(d)). On April 6, 2010, the Appellate Division affirmed the trial court's denial of the PCR petition. State v. Cho Lee Lin, et al., 2010 WL 1330272

---

[1] Oral argument on the PCR petition was conducted on November 21, 2005. A copy of the November 21, 2005 PCR Transcript ("PCRT") is attached at Exhibit C to Petitioner's Reply at Docket entry no. 13-3, 13-4 and 13-5.

(N.J. Super. A.D., April 6, 2010).  The Supreme Court denied the petition for certification on June 30, 2010.  <u>State v. Lin</u>, 203 N.J. 92 (2010).

Petitioner timely filed this habeas petition, pursuant to 28 U.S.C. § 2254, on or about October 22, 2010.  The State responded to the petition, and provided the relevant state court record, on July 18, 2011.  (Docket entry no. 12).  Petitioner filed a reply/traverse on or about August 2, 2011.  (Docket entry no. 13).

B.  <u>Factual Background</u>

The facts of this case were recounted below and this Court, affording the state court's factual determinations the appropriate deference, <u>see</u> 28 U.S.C. § 2254(e)(1), will simply reproduce the recitation as set forth in the published opinion of the Supreme Court of New Jersey, decided on October 23, 2000, with respect to Petitioner's direct appeal:

> Defendants are members of a Chinese gang known as Fuk Ching. The gang's activities included extortion, arson, and loan sharking.  At the time of the murders the gang derived profits from smuggling illegal Chinese aliens into the United States.  The immigrants purportedly paid between $20,000 and $30,000 for transportation and were required to pay back approximately $1,000 a month to the gang.  Many, if not most, of the immigrants took low-paying jobs and were forced to live as cheaply as possible, often in gang-run "safe houses."  If the immigrants did not repay the debt, they were held captive and sometimes beaten.  Some aliens became involved in the gang's criminal activities.
>
> In furtherance of the gang's operations, a ship carrying hundreds of illegal Chinese immigrants was due to arrive off the coast of Massachusetts in 1993.  Rival members within

the Fuk Ching gang decided that they would kill the gang's leader and other high-ranking members and thereby take control of those expected immigrants.  On May 24, 1993, the rivals attempted to carry out their plan by attacking a safe house in Teaneck, New Jersey.  There were four gang members and one smuggled alien living in the house, and defendants shot or stabbed all of the occupants (one occupant was actually shot outdoors as he attempted to escape harm).  Four of the victims of the attack died; one victim, the alien, survived.

Having received descriptions of the getaway van seen by witnesses, the police arrested all defendants (except defendant Lau) a short time after the shooting at a roadblock near the George Washington Bridge.  The police retrieved numerous weapons from defendants and the safe house, including guns, knives, handcuffs, a container of gasoline, and ammunition.  The police also found blood-stained clothing in the van.  Defendant Lau, who had fled the murder scene in a separate vehicle, was arrested sometime later in Florida and extradited to New Jersey.  Defendants were indicted on numerous counts of murder, attempted murder, felony murder, kidnapping, burglary, attempted arson, and various weapons offenses.

(State v. Zhu, et al., 165 N.J. 544, 547-48 (2000)).

This Court also relies upon the recitation of facts as set forth in the unpublished opinion of the Superior Court of New Jersey, Appellate Division, decided on April 6, 2010, with respect to Petitioner's appeal from denial of his state PCR petition:

These were the salient proofs at trial.  Defendants were members of Fuk Ching, a Chinese gang operating in the New York area.  Among other activities, the gang smuggled people from China into the United States.  The Fuk Ching would hold the smuggled aliens in a "safe house" until a sum of money between $20,000 and $30,000 had been paid.

At some point, there was a falling out between Fuk Ching's leader, Ah Kay, and another gang member, co-defendant Xin Dan Lin.  As a result, Ah Kay ordered the killing of Xin Dan Lin.  Two gang members were killed in New York, but Xin Dan

6

Lin managed to escape when the gun held to his head jammed. Ah Kay decided to hide out. He left his brother Ah Wong in charge of the gang and a safe house on Somerset Road in Teaneck. Ah Wong lived in the house and was responsible for handling all arrangements there. At the time of the murders, there were four gang members living in the house along with one of the smuggled aliens. It was Ah Wong and these four gang members who became defendants' victims on the evening of May 24, 1993. The alien, Lin Ling Chang, was the only survivor. He identified defendants Xin Dan Lin, Yun Lin, Chao Lin Feng, and Cho Lee Lin as among those who committed the murders and who attempted to murder him.

According to Lin Ling Chang, earlier in the day, three of the four resident gang members had left the house, leaving one gang member, Liang Qun Guo (also a brother of Ah Kay), with Lin Ling Chang. While Lin Ling Chang was in the kitchen, he heard the doorbell ring. Liang Qun Guo went to the door and moments later a number of people entered the kitchen. One of the defendants pointed a gun at Lin Ling Chang's head. Liang Qun Guo started to fight with the intruders. Gunshots were fired. Both Lin Ling Chang and Liang Qun Guo were shot. They were dragged to the basement, tied, and duct taped.

On the evening of May 24, 1993, Ming Cheng, a member of Fuk Ching and Ah Wong's bodyguard, drove from New York to Teaneck with Ah Wong and two other gang members, Yu Ping Zhang and Guang Sheng Li. Upon their arrival, they found the house locked, and no one answered the doorbell. Yu Ping Zhang and Guang Sheng Li gained entrance to the house through a window in the back. Ming Cheng went to the front door. He was not aware of how Guang Sheng Li got inside the house.

After Ming Cheng and Ah Wong had returned to the front door, the door opened and Ming Cheng heard a gunshot. He pushed the door open and saw Xin Dan Lin with a gun and several other persons on the stairs inside. He warned Ah Wong and they both ran, but in opposite directions. Ming Cheng ran two or three blocks and hid in some bushes. He saw Ah Wong lying on the ground with three people standing over him and then heard some gunshots.

Alan Tam, one of the main witnesses against defendants, was a member of the Fuk Ching. He pled guilty in federal court to charges related to the killings and agreed to testify at this trial. Alan Tam testified that in early April 1993, he

spent several days at an apartment in Brooklyn where Simon Lau, Chao Lin Feng, and Jeffrey Zhu attempted to recruit him to participate in the murder of Ah Wong. The motivation behind this plot was to gain control of the alien smuggling business and to strike back for the attempted killing of Xin Dan Lin. Alan Tam met with Ah Wong four days before the killing. He did not warn Ah Wong of the murder plot against him.

Tu Wei Chung was also a member of the Fuk Ching gang. Like Tam, he testified for the State pursuant to a plea agreement on federal charges. He corroborated Tam's testimony.

Rhonda Spencer lived in the neighborhood. She testified that shortly after 7:00 p.m., while sitting in front of her residence, she heard something that sounded like glass breaking. She also heard about four gun shots and ran down to find her younger brother who was playing on a nearby street. She saw a group of men running across a lawn. While this group of men was running, she saw another man, with a black stadium jacket, get into a blue van. The van then picked up the men who were running.

Teaneck Police Detective Kenneth Croonquist was the first police officer to arrive at the scene. Upon arrival, he approached the front door, peered in, and saw an Asian male apparently dead. A small weapon was partially under the victim's legs. Sergeant Croonquist saw knives and handguns scattered about the house. A second victim was found in the hallway, lying on his side with no pulse. Two more victims were found on the floor of the basement. Each of these victims were handcuffed and had duct tape over their mouths. One of them, Lin Ling Chang, survived. Among the assassins, Ah Wong, Guang Sheng Li, Yu Ping Zhang and Liang Qun Guo died. Ming Cheng escaped.

Teaneck Police Officer Frank Cox was on patrol in a marked police car with Officer Kenneth Porrino. Upon hearing a police broadcast of a multiple shooting in Teaneck, they drove to the toll plaza at the George Washington Bridge. At 7:33 p.m., they saw a blue van with Asian males, which fit the description provided in the SPEN emergency broadcast, approaching the toll plaza. They pulled up close behind the van, turning on the overhead lights and siren. Officer Kevin Mahon used his public announcement system to instruct the driver to throw the keys out of the window and to come out of the van. The driver was defendant Jeffrey Zhu.

(State v. Cho Lee Lin, et al., 2010 WL 1330272, *1-2 (N.J. Super.

A.D., April 6, 2010)).

Finally, in a consolidated opinion of the six direct appeals

filed by the various co-defendants in this matter, including

Petitioner's direct appeal, the Appellate Division summarized the

pertinent facts and evidence as follows:

> There were numerous guns, knives and bullets, among other
> items, found by the police throughout the house.  It was
> determined that the guns in the house were the weapons used
> to shoot the victims found in the house.
>
> A number of residents in the area heard the gun shots and
> saw much of the killing of Ah Wong, as well as the
> defendants' get-away.  As a result of their eye-witness
> accounts, the two get-away cars were identified and,
> ultimately, found, as was the nine-millimeter weapon that
> was used to shoot Al Wong and then thrown under a parked
> car.
>
> Shortly after the shootings and stabbings, one of the get-
> away vehicles, a blue van, was spotted by the police as it
> approached a toll plaza near the George Washington bridge.
> The vehicle was stopped and the five occupants, defendants
> Jeffrey Zhu, Xin Dan Lin, Yun Lin, Chao Lin Feng and Cho Lee
> Lin, were arrested and searched.  A knife sheath was found
> on Zhu.  A bullet that matched bullets in an assault weapon
> found in the front foyer of the house was retrieved from one
> of Xin Dan Lin's pockets.  Numerous inculpatory items were
> seized from the defendants and the vehicle, including blood-
> stained clothing.
>
> Blood stain analysis performed on the clothing revealed
> human blood found on Xin Dan Lin's blue jeans and shoes, on
> Chao Lin Feng's gold jacket, tee-shirt, black jeans and both
> sneakers, on Cho Lee Lin's tan jacket, and on the jacket
> found in the van. DNA analysis revealed that the blood from
> Cho Lee Lin's tan jacket matched that of Liang Qun Guo (the
> victim found murdered in the basement), that the blood found
> on Chao Lin Feng's tee-shirt matched that of Yu Ping Zhang
> (one of the victims found murdered in the hallway), and that
> the blood found on Xin Dan Lin's blue jeans also matched
> that of Yu Ping Zhang.  In addition, DNA analysis of blood

found on a jacket in the van matched the blood of victim Yu Ping Zhang.

None of the physical evidence at the scene linked Simon Lau to the crimes.  However, when the second vehicle was later found abandoned on the lower east side of Manhattan, it was discovered that it was registered to Simon Lau's sister. Moreover, Ming Cheng identified him as a participant at the scene and gang members Allan Tam and Henry Tu provided testimony that he was actively involved in the planning of the killings.
Finally, a search of Chao Lin Feng's apartment at 5413 5th Ave., Brooklyn, revealed a sketch of the layout at 1326 Somerset, which had Tam's fingerprints on it; green knife sheaths; duct tape; a match book with the name "Simon" and a telephone number inscribed on it; a plastic container similar to the containers found at 1326 Somerset that had gasoline in them; and fingerprints of both Chao Lin Feng and Xin Dan Lin.

(Resp. Ex. 4, April 5, 1999 Appellate Division Opinion, <u>State v. Lin</u>, Docket No. A-5073-95T4 slip op. at 9-10 (N.J.Super.Ct., App.Div., Apr. 5, 1999).

## II.   STATEMENT OF CLAIMS

Petitioner asserts the following claims in his petition for habeas relief:

**GROUND I**:  Petitioner's rights to due process and an impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution were violated due to trial court's inadequate voir dire and deprivation of Petitioner's statutory rights to intelligently challenge jurors for cause and exercise peremptory challenges.

**GROUND II**:  The trial court committed reversible error by denying Petitioner's motion to voir dire the jury regarding

10

published prejudicial information, thereby violating Petitioner's right to be tried by a fair and impartial jury as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and that of the New Jersey Constitution, 1947 Art. 1, Par. 10.

**GROUND III**:  The trial court erred by allowing the proceedings to be conducted in such a manner as to deprive defendant of his right to a fair trial when the trial court consistently permitted sheriff officers to act in such a manner as to give the jury the perception that the defendant was guilty, depriving Petitioner of his Fifth Amendment right to a presumption of innocence and a fair trial.

**GROUND IV**:  "The trial court's accomplice liability instruction failed to convey to the jury that in any or all of the offenses charged, the accomplice could be found guilty to a lesser degree than the principal, based on the accomplice's own mental state, eroded the prosecution's burden to prove guilt beyond a reasonable doubt, rendered Petitioner's trial fundamentally unfair in violation of his right to a fair trial and due process under the United States Constitution Amendments Sixth and Fourteenth."

**GROUND V**:  The State's suppression of favorable evidence to Petitioner and knowing use of perjured testimony is a violation of the rules of discovery and prosecutorial misconduct, thereby

violating Petitioner's right to a fair trial and due process rights secured by the United States Constitution and the New Jersey Constitution.

A. The State's suppression of police report evidence which was favorable and exculpatory was a violation of the rules of discovery, prosecutorial misconduct and a denial of Petitioner's right to a fair trial.

B.  The prosecutor failed to disclose the true nature of the plea agreement between the federal government and Alan Tam and Henry Tu.

C.  The prosecution improperly withheld and/or altered discovery in violation of right under Brady v. Maryland.

**GROUND VI**:  Petitioner was deprived of effective assistance of trial counsel when counsel failed to exercise Petitioner's six remaining peremptory challenges to strike certain jurors, which resulted in a biased jury thereby depriving Petitioner of his right to effective assistance of counsel, due process of law, and a fair and impartial jury, as guaranteed under the Fifth, Sixth and Fourteenth Amendments of the U.S. Constitution, and the New Jersey Constitution (1947) Art. I, Pars. 1, 9, 10.

**GROUND VII**:  Ineffective Assistance of Counsel in violation of the Sixth Amendment.

The State essentially contends that Grounds I and V are procedurally defaulted, and that Grounds II, III, IV, VI, and VII

12

lack merit, and/or fail to raise a federal constitutional issue. To the extent that Petitioner's Grounds I and V are procedurally defaulted, this Court will deny them on the merits pursuant to 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"). See Bronshtein v. Horn, 404 F.3d 700, 728 (3d Cir. 2005) ("We would permit Bronshtein to attempt on remand to establish a reason to excuse his procedural default, but we find it unnecessary to do so because it is apparent that the claims in question lack merit.  Under 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here").

### III.   STANDARD OF REVIEW

A pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972). A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).  Thus, because Davenport is proceeding as a pro se litigant in this matter, the Court will accord his habeas

petition the liberal construction intended for pro se
petitioners.

Section 2254(a) of Title 28 of the United States Code gives
the court jurisdiction to entertain a habeas petition challenging
a state conviction or sentence only where the inmate's custody
violates federal law.  28 U.S.C. § 2254(a).

"In conducting habeas review, a federal court is limited to
deciding whether a conviction violated the Constitution, laws, or
treaties of the United States." Estelle v. McGuire, 502 U.S. 62,
67-68 (1991); 28 U.S.C. § 2254(a); accord Barry v. Bergen County
Probation Dep't, 128 F.3d 152, 159 (3d Cir. 1997).  "Federal
courts hold no supervisory authority over state judicial
proceedings and may intervene only to correct wrongs of
constitutional dimension." Smith v. Phillips, 455 U.S. 209, 221
(1982).  Generally, "[i]f a state prisoner alleges no deprivation
of a federal right, § 2254 is simply inapplicable," Engle v.
Isaac, 456 U.S. 107, 120 n. 19 (1982), and "a state court's
interpretation of state law, including one announced on direct
appeal of the challenged conviction, binds a federal court
sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, 76
(2005).

In reviewing a § 2254 petition, a federal court is not
permitted to address a federal constitutional claim pertinent to
the facts of the case unless the petitioner asserts the claim as

14

a ground for relief.  That is, "errors of state law cannot be
repackaged as federal errors simply by citing the Due Process
Clause."  Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d Cir. 1997).
In addition, "it is well established that a state court's
misapplication of its own law does not generally raise a
constitutional claim."  Smith v. Horn, 120 F.3d 400, 414 (3d Cir.
1997)(citations and internal quotation marks omitted); see also
Smith v. Zimmerman, 768 F.2d 69, 71, 73 (3d Cir. 1985).

In addition to the case law, the Antiterrorism and Effective
Death Penalty Act ("AEDPA") limits a federal court's authority to
grant habeas relief when a state court has adjudicated
petitioner's federal claim on the merits.  See 28 U.S.C. §
2254(d).  Where a federal claim was "adjudicated on the merits"
in state court proceedings, the writ must be denied unless
adjudication of the claim either involved an unreasonable
application of clearly established federal law, or was based on
unreasonable determination of the facts in light of the evidence
before the state court.  See 28 U.S.C. § 2254(d).

The unreasonableness standards of § 2254(d) govern only
claims that were "adjudicated on the merits in State Court
proceedings."  28 U.S.C. § 2254(d).  "An 'adjudication on the
merits' has a well settled meaning: a decision finally resolving
the parties' claims, with res judicata effect, that is based on
the substance of the claim advanced, rather than on a procedural,

15

or other, ground." Rompilla v. Horn, 355 F.3d 233, 247 (3d Cir.
2004)(citations and internal quotation marks omitted), reversed
on other grounds sub nom. Rompilla v. Beard, 545 U.S. 374
(2005); see also Rolan v. Vaughn, 445 F.3d 671, 678 (3d Cir.
2006). A state court may render an adjudication on the merits of
a federal claim by rejecting the claim without any discussion
whatsoever. See Rompilla, 355 F.3d at 247. See also Chadwick v.
Janecka, 312 F.3d 597, 605-06 (3d Cir. 2002), cert. denied, 538
U.S. 1000 (2003)(citing Weeks v. Angelone, 528 U.S. 225, 237
(2000)(even a summary adjudication by the state court on the
merits of a claim is entitled to § 2254(d) deference)). On the
other hand, "[i]f the petitioner's legal claims were presented
but not addressed by the state courts, 28 U.S.C. § 2254(d) does
not apply." Rolan, 445 F.3d at 678. See also Hameen v. State of
Delaware, 212 F.3d 226, 248 (3d Cir. 2000)(with respect to claims
presented to, but unadjudicated by, the state courts, however, a
federal court may exercise pre-AEDPA independent judgment), cert.
denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL
1523144, *6 n.4 (D.N.J. 2000).

    If the New Jersey courts adjudicated the petitioner's claims
on the merits, this Court may not grant relief unless either §
2254(d)(1) or § 2254(d)(2) is satisfied. See 28 U.S.C. §
2254(d). Accordingly, this Court may not grant habeas relief to
the petitioner unless the adjudication of a federal claim by the

16

New Jersey courts involved an unreasonable application of clearly established Supreme Court law, see 28 U.S.C. § 2254(d)(1), or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding and Adamson is in custody in violation of the Constitution or laws or treaties of the United States.  See 28 U.S.C. § 2254(a), (d)(2).

When the grounds raised in the petition are governed by 28 U.S.C. § 2254(d)(1), the court must begin its analysis by determining the relevant law clearly established by the Supreme Court.  See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004). Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000).  A court must look for "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71, 72 (2003).

A decision is "contrary to" a Supreme Court holding within 28 U .S.C. § 2254(d)(1), if the state court "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." Williams, 529 U.S. at 405-06.  Under the "'unreasonable application' clause of § 2254(d)(1), a federal

17

habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Whether a state court's application of federal law is "unreasonable" must be judged objectively; an application may be incorrect, but still not unreasonable.[2] See id. at 409-10. "The unreasonable application test is an objective one-a federal court may not grant habeas relief merely because it concludes that the state court applied federal law erroneously or incorrectly." Thomas v. Varner, 428 F.3d 491, 497 (3d Cir. 2005) (quoting Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005)).

Finally, federal courts are required to apply a "presumption of correctness to factual determinations made by the state court." Id.; see also 28 U.S.C. § 2254(e)(1). The Third Circuit has ruled that this presumption of correctness based upon state court factual findings can only be overcome by clear and convincing evidence. See Duncan, 256 F.3d at 196 (citing 28 U.S.C. § 2254(e)(1)). Consequently, a habeas petitioner "must clear a high hurdle before a federal court will set aside any of

---

[2] See also Marshall v. Hendricks, 307 F.3d 36, 71 n. 24 (3d Cir. 2002)("[D]ecisions of federal courts below the level of the United States Supreme Court may be helpful to [a court] in ascertaining the reasonableness of state courts' application of clearly established United States Supreme Court precedent, as well as helpful amplifications of that precedent.")(citations and internal quotation marks omitted).

the state court's factual findings." <u>Mastracchio v. Vose</u>, 274
F.3d 590, 597-98 (1st Cir. 2001).

IV.   <u>ANALYSIS</u>

A.   <u>Jury Selection Procedures Claim</u>

In his first claim for relief, Petitioner asserts that the
jury selection procedures at his trial violated his
constitutional rights to due process and a fair and impartial
jury as guaranteed under the Sixth and Fourteenth Amendments.  In
particular, Petitioner claims that the trial court conducted a
cursory jury voir dire that infringed his ability to
intelligently challenge jurors for cause and exercise his
peremptory challenges.

Prior to jury selection, the trial court decided, with the
agreement of all parties, that an extensive juror questionnaire
should be prepared so as to address numerous concerns regarding
the trial.  These concerns involved the security measures to be
taken by the Sheriff's Department at trial; media and news
reports that had covered aspects of the Petitioner's case
involving Chinese gangs and the smuggling of illegal aliens; the
fact that Petitioner, his co-defendants and most of the victims
were illegal aliens; and a substantial likelihood that racial
issues would be inextricably bound with issues to be decided at
trial and bias on the part of potential jurors.  Accordingly, on
May 30, 1995, the trial court ordered that defense counsel submit

19

a draft of proposed voir dire questions and designate two
attorneys to conduct individual voir dire questioning should such
individual voir dire questioning be required.  Each potential
juror was to complete the questionnaire before their in-court
voir dire, which, among other things, would indicate his/her
occupation, familiarity with the case, attitude towards illegal
immigrants and gangs and defendants' race.  The completed
questionnaires were to be photocopied by the prosecutor's office
and each defendant's counsel would be given a copy to review
before voir dire.  (Pet. at pg. 16).

At the beginning of jury selection, the trial court voir
dired prospective jurors based on their answers to the
questionnaires.  Defense counsel was then allowed to ask follow-
up questions based on the answers to the questionnaires.  This
became a time-consuming process such that after two whole days of
jury selection, only six jurors were qualified.  Consequently,
the prosecutor complained and the trial court "dramatically
reduced" the number of questions posed to prospective jurors.  In
addition, as Petitioner argues:

> The questions asked were leading in nature - making the
> correct answer unmistakably clear to the jurors, by placing
> the weight of the court's authority behind a suggested
> answer.  Moreover, when a biased answer was offered by a
> juror, the court would abruptly intercede with close-ended,
> heavy-handed and highly leading questions; not probing for
> the source of possible bias, but aimed to qualify a juror
> via programmed "yes" or "no" response.

(Pet. at pp. 16-17).

Case 2:10-cv-05502-DMC   Document 16   Filed 08/01/12   Page 21 of 74 PageID: 1710

Defense counsel objected to this process, but the trial court ignored the complaints, noting that defense counsel had drafted the questionnaires.

Petitioner further asserts that, because the prosecutor complained about photocopying the questionnaires, the trial court ruled that no standard voir dire questions would be asked, that the court would only rely on the completed questionnaires to conduct voir dire, and that the defense would not be given a copy of the questionnaire. Petitioner concedes that the court did agree to defense counsels' suggestion that, under these circumstances, all questions contained in the questionnaire would be asked verbally so counsel could hear the answers. (Pet. Brief at pp. 17-18).

However, as Petitioner relates, when voir dire resumed, the trial court failed to ask all the questions, and in fact, fifty (50) out of the sixty-six (66) qualified jurors were asked only two or three pointed questions. Petitioner further asserts that the trial court spent less than one minute on each voir dire when selecting five of the sitting jurors. Defense counsel again objected, but their objection was ignored. (Pet. at pp. 18-19).

Despite this abbreviated voir dire, after seven full days of jury selection, only 46 jurors were qualified from a pool of 500 prospective jurors. Consequently, the court further expedited the selection process by delegating to the jury commissioner the

authority of pre-qualifying potential jurors.  The court also unilaterally reviewed the questionnaires for anything of concern then let defense counsel review them.  Thus, Petitioner contends that defense counsel were "forced to review the questionnaire via circulation while the court [was] conducting the in-court voir dire of the jurors," in direct violation of [P]etitioner's right to be present at a critical stage of his trial.  (Pet. at pg. 19).  In other words, Petitioner argues, this "ex parte" process by the trial court removed defense counsel's ability to review the questionnaires before voir dire and subverted counsels' ability to ask follow-up questions to determine if the court's follow-up questions.

Petitioner thus argues that this truncated process  hampered his ability to participate in jury voir dire, detect bias and intelligently exercise his peremptory challenges, resulting in the denial of his right to a fair and impartial jury.  Further, when the court was confronted with juror bias in the questionnaire, the court sought to qualify the jurors with leading questions designed to elicit a suggested response.  (Pet. at pg. 19).

In particular, Petitioner points to the selection of three jurors, who ultimately sat on the jury, which demonstrated bias violated Petitioner's right to a fair and impartial jury.  First, Juror D.R. indicated on the questionnaire that she could not

decide each defendant's guilt or innocence separately, but the trial judge did not ask a follow-up question on voir dire.  D.R. also answered that she read the Bergen Record every day and had heard or read about this case prior to trial.  The court never asked D.R. about any bias or prejudice she may have had based on this prior knowledge.  Finally, D.R. answered that she did not know if she would give law enforcement testimony greater, lesser or equal weight as other testimony.  On voir dire, the trial court allegedly forced the juror to respond, "I think so."  (Pet. at pp. 19-20).

Next, as to Juror E.O., the juror responded "Yes" to Question 31 of the questionnaire, which asked whether the immigration status of the defendants would affect her ability to deliberate fairly and decide the case solely on the facts.  Juror E.O. repeated this response when the judge questioned her on voir dire several times.  The judge continued to ask the same question until E.O. changed her answer.  Defense counsel objected to the court's manipulation of the juror, and challenged the juror for cause.  Nevertheless, the court denied their motion.  Finally, E.O. indicated she had a son-in-law who was a police officer, but responded to the voir dire by the court that she would evaluate the credibility and testimony of a police officer the same as anyone else.  Juror E.O. was selected for the jury.  (Pet. at pp. 20-22).

Finally, as to the third juror, Juror A.R., it was revealed on voir dire that she had a brother who was murdered in August 1994 and that the suspect was an illegal alien.  In response to the court's questions, A.R. answered that this fact would not affect her ability to be fair because she did not plan to get involved in her brother's case.  Co-counsel requested that A.R. be dismissed from the jury for cause, but the court inexplicably denied the motion.  (Pet. Brief at pp. 22-24).

Petitioner raised this claim in his state PCR petition.  In ruling on the issue, the PCR court held as follows:

> [Defendants raise] certain requests concerning jury selection.  In that regard, there is the jury questionnaire, a very extensive one prepared, and it was prepared through the cooperation of defense counsel, with the prosecutor participating, and with the Court to some extent.  Twelve pages with an attached list of witnesses and so forth.  And I know Mr. Zhu obtained an affidavit of Mr. Pieroni which raises, I think, questions of what he says is not quite accurate.  He says there was only one for all six defense attorneys, and I know that's not accurate, because Mr. Murray was providing the first until whatever reason he became upset with some argument of counsel, and I don't remember what it was now, he wasn't going to do it. But thereafter, they were provided, sometimes a little slower than liked.

> But Mr. Pieroni says there was only one copy, but he ends up with 800 pages of jury questionnaire[s], and that would mean that no one else had them but him, and that's not so. Knowing Mr. McAlevy and Mr. Neary, they would not end up without their file, and I don't mean to say that Mr. Weichsel, Contaldi or Jerejian wouldn't.  It is clear they were being submitted, because Mr. Pieroni says there were fifteen pages.... [T]he panel selection was not—we didn't fill a seat up at one time, we waited until we had a certain number and then proceeded to pick the jury.  Then the appellate court would have to understand this is not a normal se[le]ction where a panel comes in, put fourteen in

the box, and find out if they could serve or not serve.
This was done by first finding out if they could spend the
time, and then they filled out the questionnaire. Of the
200 jurors who showed up, according to Mr. Pieroni, I would
assume that at least half walked out on a fifty-two day
trial with job, plans, employment.

In fact, I personally think the 200 who were never actually
screened, it is more than 200, and, of course, while he
complains, Mr. Pieroni, he says fifty pages of
questionnaire. It's not like reading a book. We all know
certain questions are very important, some are not. You
want to know where they work, where they live. Then you
want to know such items like what newspaper they read, what high
school they went to, and the issue concerning law
enforcement officers is covered in the questions.

As I said, prepared by the defendants, gone over by the
Court, and now after the trial is over we're being told that
three jurors should not be allowed to sit on the case. The
defendants had not run out of challenges. As I said, you
deal with between McAlevy, Weichsel, Jerejian, Neary, and-I
shouldn't say McAlevy here, but McAlevy is a well known
criminal defense attorney who is constantly trying murder
cases all over New Jersey. Neary is trying them in Bergen
County, at least two a year, if not more. Jerejian tries
them. John Weichsel tries them. Contaldi has been involved
with them. Pieroni, who is a regular appearing in criminal
trials in this courthouse, and they're all very active
defense attorneys.

As I said, some of the premier ones, that there is a juror
that shouldn't be there, is total nonsense, and that jurors
were rehabilitated is-sometimes there are jurors you like,
because they're making a promise to you that they will be
fair and impartial. They didn't check it off as a routine
because they wanted to get on jury duty. They're making the
promise, and as I say, the trial lawyers relied upon that
promise, more so than others.

There may be certain things that you like about that person,
which doesn't show here. The appearance to understand a
respective juror. How they talk. You know, their voice
means a lot. People, when evaluating jurors, how they walk,
do they slouch, do they stand up straight, do they stand up
tall. Are they leaders, because that's one of the questions
that was asked. Do they supervise people.

The purpose of that is to find out people in charge of people.  Do they take care of people, leave and promoted. I'd find beyond belief that six very active defense attorneys would allow someone like Miss Rakowski there, that they didn't think—or O'Brien, Reavis.  As I said, with regard to that one, the last death penalty case I tried, one of the jurors who stayed on had a father killed in a burglary—it really was not quite a burglary but taking a cash box by someone who even worked at the Sears, or leaving to go to another building on their property, and that was the one juror who voted for life over death.

So there are reasons for leaving them on when you're a defendant.  Again, you evaluate the entire person, not part of the answer.  I don't find that defendants-and it's my recollection, not that you can check it out, but I believe all defendants had a few challenges left-maybe not Mr. Pieroni, but most of the other defendants had challenges left.  So, it wasn't a question that this was forced down their throat.

(November 21, 2005 PCRT 91:15-95:15, attached as Exhibit "C" to

Petitioner's Reply, Docket entry no. 13-5).

The State responds to this claim, asserting that it is

procedurally defaulted because the Appellate Division rejected

the claim on the basis of a state procedural bar, namely,

N.J.Ct.R. 3:22-4 (Bar on Grounds Not Raised in Prior

Proceedings).  It is clear, however, that the PCR court addressed

the merits of this claim and rejected it on those grounds as

well.  In any event, as stated above, to the extent that

Petitioner's claims are procedurally defaulted, this Court may

deny them on the merits pursuant to 28 U.S.C. § 2254(b)(2).  See

Bronshtein, 404 F.3d at 728 ("We would permit Bronshtein to

attempt on remand to establish a reason to excuse his procedural

default, but we find it unnecessary to do so because it is

apparent that the claims in question lack merit.  Under 28 U.S.C.

§ 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here"). Accordingly, this Court will turn to the merits of this claim.

"Voir dire examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges." Mu'Min v. Virginia, 500 U.S. 415, 431 (1991). "No hard-and-fast formula dictates the necessary depth or breadth of voir dire." Skilling v. United States, __ U.S. __, 130 S.Ct. 2896, 2917 (June 24, 2010). "The Constitution ... does not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury. Even so, part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." Morgan v. Illinois, 504 U.S. 719, 729 (1992).

In the federal prosecution of Jeffrey Skilling, the chief executive officer of Enron, the Supreme Court rejected Skilling's claim that the voir dire was insufficient because jury selection lasted only five hours, most of the court's questions were conclusory and failed to adequately probe jurors true feelings, and the court consistently took prospective jurors at their word once they claimed they could be fair. See Skilling, 130 S.Ct. at 2918. In that case, the district court "initially screened venire members by eliciting their responses to a comprehensive questionnaire drafted in large part by Skilling. That survey helped to identify prospective jurors excusable for cause and

served as a springboard for further questions put to remaining members of the array." Id. at 2919.  The Supreme Court held that Skilling failed to show that the five-hour voir dire violated Skilling's constitutional right to an impartial jury:

> The District Court, moreover, did not simply take venire members who proclaimed their impartiality at their word ....
> [A]ll of Skilling's jurors had already affirmed on their questionnaires that they would have no trouble basing a verdict only on the evidence at trial.  Nevertheless, the court followed up with each individually to uncover concealed bias.  This face-to-face opportunity to gauge demeanor and credibility, coupled with information from the questionnaires regarding jurors' backgrounds, opinions, and sources of news, gave the court a sturdy foundation to assess fitness for jury service . ...  The jury's not-guilty verdict on nine insider-trading counts after nearly five days of deliberation, meanwhile, suggests the court's assessments were accurate.  Skilling, we conclude, failed to show that his voir dire fell short of constitutional requirements.

Skilling, 130 S.Ct. at 2922-2923 (citations and footnotes omitted).

Here, "there were eight days of jury selection," State v. Zhu, 165 N.J. at 551, as opposed to five hours in Skilling.  In Petitioner's case, like Skilling's, the Law Division used a questionnaire prepared by defense and the judge followed up with face-to-face questioning aimed at bias.  Also, the fact that the jury found Petitioner not guilty of counts 10, 11, 12, 18, 19, 20, 21, and 36 suggests that the trial court's and defense counsels' assessments of juror fitness were accurate.  At the very least, fair-minded jurists would disagree whether the voir dire was so inadequate that Petitioner was not able to identify unqualified jurors and, in that case, the standard under

§ 2254(d)(1) is not satisfied.  See Harrington, 131 S.Ct. at 786;
Morgan, 504 U.S. at 729.

Petitioner also singles out three jurors who, he claims,
were actually biased.  "In reviewing claims of this type, the
deference due to [trial] courts is at its pinnacle: 'A trial
court's findings of juror impartiality may be overturned only for
manifest error.'"  Skilling, 130 S.Ct. at 2923 (quoting Mu'Min,
500 U.S. at 428).  In this case, as in Skilling, no defense
counsel regarded these jurors as so biased as to warrant exercise
of a peremptory challenge.  Skilling, 130 S.Ct. at 2923 n. 31
("[U]se [of] a peremptory challenge to effect an instantaneous
cure of [a trial judge's erroneous for-cause ruling] exemplifies
a principal reason for peremptories: to help secure the
constitutional guarantee of trial by an impartial jury")
(citation and internal quotation marks omitted).  Moreover, here,
as in Skilling, the trial judge (and defense counsel) "had looked
[each of these jurors] in the eye and ... heard all [their]
answers and] found [their] assertions of impartiality credible."
Id. at 2924 (citations and internal quotation marks omitted).
Under these circumstances, the New Jersey courts' adjudication of
Petitioner's inadequate voir dire claim was not contrary to, or
an unreasonable application of Skilling or other Supreme Court
holdings.  Accordingly, this claim will be denied for lack of
merit.

B.  Failure to Voir Dire Jury on Prejudicial Publicity

     In Ground Two of his habeas petition, Petitioner contends
that the trial court committed reversible error by denying
defendants' request to voir dire jurors regarding published
prejudicial information, namely, a newspaper article appearing in
the Bergen Record on December 5, 1995, which had revealed the
substance of co-defendants' statements, and in particular,
Petitioner's statement, to police during interrogation and was
not presented to the jury as evidence during trial, in violation
of Petitioner's Sixth and Fourteenth Amendment rights.

     These claims were raised by Petitioner and the co-defendants
on direct appeal.  In particular, the facts regarding
Petitioner's Claim Two were recited by the Appellate Division in
its April 5, 1999 Opinion, as follows:

> Because there had been pretrial publicity of the case, the
> trial judge incorporated in his jury selection questionnaire
> a number of questions that probed the prospective jurors'
> awareness of and/or exposure to such publicity and, if so,
> whether the publicity had led to their having formed an
> opinion about the case.  He also gave publicity-related
> warnings during the selection process and periodically
> throughout the trial.
>
> During the selection process, an article appeared in the
> local newspaper regarding a hunger strike defendants engaged
> in to protest alleged abuses against them by the Sheriff's
> office. The trial judge refused a request to voir dire the
> prospective jurors about the article but did, as it had
> previously, caution the jurors not to listen to any media
> accounts on TV or radio and not to read any newspaper
> articles regarding the case.  He specifically warned the
> panel about the article in that day's paper and reminded
> them that the case had to be decided based on the evidence
> presented in the courtroom, not on what was printed in a
> newspaper.

On September 26, 1995, just prior to opening arguments,
defense counsel brought to the trial judge's attention an
article in that Sunday's Star Ledger which included photos
of all the defendants and a headline which read, "Who Pulled
the Trigger?" The first sentence of the article read, "[i]t
was one of the bloodiest murders the state has ever seen"
.... The trial judge refused counsel's request to voir dire
the jury regarding the article, observing that the Star
Ledger was not as well read in Bergen County as the Record
and the Herald News.  But he again cautioned the jury not to
read any newspaper articles or listen to any TV or radio
broadcasts about the case.  The jury was also told that
newspaper and media accounts were not evidence, were often
based on second- or third-hand information, were not always
accurate, and were not subject to cross-examination by the
attorneys....

The issue of prejudicial publicity did not arise again until
the middle of the trial.  On October 19, 1995, Zin Dan Lin's
counsel was arrested for allegedly assaulting a sheriff's
officer as he was leaving the courtroom.  The incident
apparently occurred out of the presence of the jury.  But a
few days later on October 22, 1995, counsel requested a jury
voir dire, noting that the news regarding the arrest was
"all over the courthouse" and everyone was talking about it.
The trial judge agreed to do so.  Each juror was separately
questioned.

* * *

[The trial judge ultimately] denied defendants' request for
a mistrial but granted the alternative request to dismiss
[one] juror.  During argument on the application, the
prosecutor asserted, "[y]ou're just letting them win.  We
started with fifteen when we should have had sixteen.  We
lost one.  We're going to have one alternative now?"

We cannot be sure, but it may have been this comment which
prompted the trial judge to state the next day, in the face
of yet more publicity, "[t]here are not going to be any more
jury voir dires."  The additional publicity was as follows.
In that morning's Record the prosecutor was quoted as
alleging that defense counsel were maneuvering for a
mistrial because they knew "they don't have a case."  [Two
other articles allegedly quoting the prosecutor were brought
to the judge's attention.]

This prompted the judge to enter a gag order against all
attorneys and all members of the Sheriff's Department.  But

he declined to voir dire the jurors on the three news
articles ...

\* \* \*

In essence, the trial judge, though troubled by the then
flood of publicity, viewed the articles, for the most part,
as extraneous to the case and not containing any evidential
or prejudicial material.  In light of his prior admonitions
to the jury concerning publicity about the case, the judge
found no need to go through another round of voir dires.  We
think his reasoning for not doing so is sound and find no
basis for interfering in the exercise of his discretion.

More troublesome, however, is the judge's handling of an
article that appeared in the <u>Record</u> on December 5, 1995.
When the jury was excused on December 4, 1995, it was not
cautioned about news articles, although it had been so
cautioned periodically throughout the trial.  The article
that appeared the next day in the <u>Record</u> was placed on pages
one and five of the local section and bore the rather
innocuous headline "Defense arguments begin in gang case."
On page one, the article stated that two of the defendants
had not presented a defense but that codefendant Zhu had
called five witnesses in an attempt to show that he was "an
unwitting bystander" who had left Boston in May to see a
concert.  The article continued on the fifth page....  It
then set forth in one paragraph the prosecutor's theory that
the killings resulted from a power struggle within the ranks
of the Fuk Ching gang, and followed with information that
the defense would wrap up their case quickly....  [T]he
article also reported that the trial judge had determined,
following a mid-trial voluntariness hearing, that the
defendants' statements could be used at trial should they
testify because the allegations that the police had beaten
and coerced them were false.  Specifically, the article
stated:

>    None of the remaining three defendants is expected to
>    take the stand in the wake of Judge William C. Meehan's
>    decision that the statements the men gave to police
>    could be used against them.  Last week, defense
>    attorneys had argued that the defendants were beaten
>    and coerced....  But Monday morning, Meehan decided the
>    accusations were false and the statements were
>    admissible.
>
>    According to summaries of those statements, which
>    likely will never be heard by the jury, four of the
>    defendants admitted to being at the scene, but none

said he killed anyone.  Dan Xin Lin said he pointed his Uzi at one of the injured victims, but that the gun failed.  Chao Lin Feng said he was offered $100,000 to participate in the revenge killings, while Jeffrey Zhu admitted he drove four of the defendants to Teaneck and had been told to go upstairs in the house to serve as a lookout.

Meanwhile, one defendant, Cho Lee Lin, said he had been held hostage in the house for a month and, when he heard the shots, crawled out a window and hid in the van.  Another, Yun Lin, said he rode in the van, but that it never stopped and he never saw any weapons or blood.

The sixth defendant, Simon Lau, who was arrested in Florida this year, never made a statement to police.  A seventh suspect, Shing Chung, remains at large.

The recitation at the end of the article of defendants' police statements casts this article in a different light from all of the others.  Though the statements could have become evidential, albeit with limiting instructions, they did not since defendants chose not to testify.  The December 5, 1995 article, thus, contained evidence that was never presented to the jury. The potential for prejudicial jury taint, then, was for more serious than with the prior articles....  [W]hen the jury was brought into the courtroom, the judge instructed:

Before we start, it was brought to my attention yesterday I forgot to remind you please do not read any articles relating to this case.  Articles are not always accurate and correct and are not evidence in the case.  Please don't read any articles or discuss them among yourselves or with anyone else.

State v. Lin, Docket No. A-5041-95T4 slip op. at 15-25.

The Sixth Amendment of the United States Constitution provides that "the accused shall enjoy the right to ... trial by an impartial jury."  U.S. Const. amend. VI.  "The theory of our [trial] system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public

33

print." Skilling, supra, 130 S.Ct. at 2913. Supreme Court
"decisions, however, cannot be made to stand for the proposition
that juror exposure to ... news accounts of the crime ... alone
presumptively deprives the defendant of due process. Prominence
does not necessarily produce prejudice, and juror *impartiality*,
we have reiterated, does not require *ignorance*." *Id.* at 2914-15
(citation and internal quotation marks omitted)(emphasis in
original). See also Irvin v. Dowd, 366 U.S. 717, 722 (1961)
(Jurors are not required to be "totally ignorant of the facts and
issues involved"; "scarcely any of those best qualified to serve
as jurors will not have formed some impression or opinion as to
the merits of the case"). Moreover, "[t]he jury's ability to
discern a failure of proof of guilt of some of the alleged crimes
indicates a fair minded consideration of the issues and
reinforces our belief and conclusion that the media coverage did
not lead to the deprivation of [the] right to an impartial
trial." Skilling, 130 S.Ct. at 2916 (quoting United States v.
Arzola-Amaya, 867 F.2d 1504, 1514 (5th Cir. 1989)).

The Supreme Court noted that its "decisions have rightly set
a high bar for allegations of juror prejudice due to pretrial
publicity. News coverage of civil and criminal trials of public
interest conveys to society at large how our justice system
operates. And it is a premise of that system that jurors will
set aside their preconceptions when they enter the courtroom and
decide cases based on the evidence presented." Skilling, 130

S.Ct. at 2925 n.34.  "Jurors ... need not enter the box with empty heads in order to determine the facts impartially.  'It is sufficient if the juror[s] can lay aside [their] impression[s] or opinion[s] and render a verdict based on the evidence presented in court.'"  Skilling, 130 S.Ct. at 2925 (quoting Irvin v. Dowd, 366 U.S. 717, 723 (1961)).

When pretrial publicity is at issue, "primary reliance on the judgment of the trial court makes [especially] good sense" because the judge "sits in the locale where the publicity is said to have had its effect" and may base her evaluation on her "own perception of the depth and extent of news stories that might influence a juror."  Mu'Min v. Virginia, 500 U.S. 415, 427 (1991).  "Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record-among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty.  In contrast to the cold transcript received by the appellate court, the in-the-moment voir dire affords the trial court a more intimate and immediate basis for assessing a venire member's fitness for jury service."  Skilling, 130 S.Ct. at 2918.  Lines of inquiry that "might be helpful in assessing whether a juror is impartial" are not hard to conceive.  Mu'Min, 500 U.S. at 425.  "To be constitutionally compelled, however, it is not enough that such questions might be

helpful.  Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair."  Id. at 425-426.  Fundamental unfairness arises if voir dire is not "adequate ... to identify unqualified jurors."  Morgan, 504 U.S. at 729.

In Mu'Min, the Supreme Court held that the Constitution does not require the state trial court to put questions about the content of publicity to potential jurors.  Id. at 425-26.  The Supreme Court concluded:

> The voir dire examination conducted by the trial court in this case was by no means perfunctory.  The court asked the entire venire of jurors four separate questions about the effect on them of pretrial publicity or information about the case obtained by other means.  One juror admitted to having formed a belief as to petitioner's guilt and was excused for cause.  The trial court then conducted further voir dire in panels of four, and each time an individual juror indicated that he had acquired knowledge about the case from outside sources, he was asked whether he had formed an opinion; none of the jurors seated indicated that he had formed an opinion.  One juror who equivocated as to her impartiality was excused by the trial court on its own motion.

Mu'Min, 500 U.S. at 431.

In this case, the Appellate Division rejected Petitioner's publicity claim as follows:

> In State v. Bey ..., 112 N.J. at 74-92, 548 A.2d 846, the [New Jersey Supreme] Court emphasized the need for determining whether jurors were exposed to prejudicial outside influences in the context of trial publicity....  If ... the Court determines that there is a realistic possibility that information with the capacity to prejudice defendant's right to a fair trial may have reached members of the jury, it should conduct a voir dire to determine whether any exposure has actually occurred ...
>
> * * *

To begin with, we are convinced that it is only defendants'
police statements that might be prejudicial should the
jurors have learned of them through the news articles....
But reference to those statements was at the end of the
article and located on a continued page.  Moreover, there is
no indication in the caption of the article that such
information might be found therein.  In addition, the
statements were not *per se* inadmissible and would have been
used by the State to impeach defendants had they
testified....

Moreover, for most of the defendants, the statements were
not incompatible with the general thrust of the defense.
The defense proffered at trial, generally, was that the
State's evidence was suspect and that, if the jury were to
conclude that they were at the scene, they were not involved
in purposeful or knowing murders.  We recognize that the
reported statements of Chao Lin Feng and Yun Lin might seem
contradictory to their trial defense in that each seemed to
argue at trial that they were mistakenly identified as
perpetrators, either as principle of accomplice, whereas
their statements placed each at the scene. However, the
statements, even if learned of by the jurors, pale in
comparison to the overwhelming evidence properly presented
to the jury.  We cannot see how knowledge of them could
have, therefore, been prejudicial.

In any event, we are satisfied the second step of the <u>Bey</u>
analysis was not established.  Unlike the situation
presented in <u>Bey</u> where the highly prejudicial information
had been the subject of repeated coverage in the press (at
least five newspaper articles), the complained-of material
here was published only once.  It received no prominence.
Indeed, as we have said, the reported statements were
located in the middle of the New Jersey section of the paper
at the end of an otherwise innocuous article.  None of the
objectionable material was even hinted at in the headline.
Hence, the extent, notoriety and prominence of the media
coverage afforded this material militates against a finding
that a repeated publicity-warned juror was exposed to it.

We also take note of the fact that his jury seems to have
rather conscientiously weighed and analyzed the evidence.
The acquittals of the arson felon-murders, the kidnapping
felony-murders of Liang Wang Guo, Yu Ping Zhang, Guang Sheng
Li, and the possession of a defaced .25 caliber Raven Arms
semi-automatic revolver, reflect that.

* * *

Therefore, while it might have been better had the trial judge acceded to the request to voir dire the jurors, we are convinced the failure to do so was not error requiring a reversal.

State v. Lin, Docket No. A-5041-95T4 slip op. at 27-33 (citations and internal quotation marks omitted).

Here, Petitioner argues in his Reply that the New Jersey courts' rejection of his publicity claim was contrary to, or an unreasonable application of Sheppard v. Maxwell, 384 U.S. 333 (1966). Sheppard was a § 2254 case brought by Dr. Sam Sheppard who was indicted for murdering his wife and who faced the death penalty. The Supreme Court ruled that the pretrial and trial publicity deprived Sheppard of a fair trial. However, Sheppard is factually distinguishable, in that Sheppard faced the death penalty; the judge merely requested or suggested that the jury refrain from reading, watching or listening to reports about the case; the judge allowed the newspapers to publish the names and addresses of jurors, who were bombarded with press and letters; three months before trial, a public inquest was televised, where Sheppard was examined for five hours without counsel and the inquest "ended in a public brawl," id. at 354; the trial began two weeks before a hotly contested election at which both the Chief Prosecutor and the judge were candidates for judgeships; "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom," id. at 355, and a press table was set up inside the bar; "[p]articipants in the

trial, including the jury, were forced to run a ga[u]ntlet of

reporters and photographers each time they entered or left the

courtroom," id.; and

> [m]uch of the material printed or broadcast during the trial
> was never heard from the witness stand, such as the charges
> that Sheppard had purposely impeded the murder investigation
> and must be guilty since he had hired a prominent criminal
> lawyer; that Sheppard was a perjurer; that he had sexual
> relations with numerous women; that his slain wife had
> characterized him as a "Jekyll-Hyde"; that he was "a
> barefaced liar" because of his testimony as to police
> treatment; and finally that a woman convict claimed Sheppard
> to be the father of her illegitimate child.  As the trial
> progressed, the newspapers summarized and interpreted the
> evidence, devoting particular attention to the material that
> incriminated Sheppard, and often drew unwarranted inferences
> from testimony.  At one point, a front-page picture of Mrs.
> Sheppard's blood-stained pillow was published after being
> 'doctored' to show more clearly an alleged imprint of a
> surgical instrument.

Id. at 356-57.

The facts in this case regarding prejudicial publicity pales

in comparison to the media circus that occurred in and outside

the courtroom in Sheppard.  Moreover, the daily assault of media

and press coverage with highly prejudicial and non-evidentiary,

inflammatory information, to the point that even jurors were

included in the media scrutiny, is factually distinguishable from

this case.  Accordingly, this Court holds that the New Jersey

courts' rejection of this prejudicial publicity claim is not

contrary to, or an unreasonable application of Skilling,

Sheppard, or other Supreme Court holdings, and Petitioner is not

entitled to habeas relief on this ground.

C.  Court Security Measures Violated Due Process

In Ground III of his habeas petition, Petitioner argues that the security measures impermissibly gave the jury the perception that he was guilty and thereby deprived him of a fair trial, as guaranteed under the Fifth, Sixth and Fourteenth Amendments. In particular, Petitioner alleges that his trial was marked by "an unprecedented and pervasive presence of Bergen County Sheriff Officers and other police officers in the courtroom at all times, commencing with the first day of trial. These officers were constantly standing by or near the defendants, as if on the look out for an attempted escape or commission of acts of violence by the defendants, who stood accused of several extremely violent acts. In short, the courtroom too[k] on the appearance of a war zone or an armed camp." (Pet. at pg. 30). Petitioner further argues:

"On the first day, co-counsel made reference to the needless and extraordinary security procedures that were being employed, including the searching of counsel, the jurors and court personnel. ... . [T]here were six Sheriff Officers, one for each defendant, and they were standing directly behind each defendant. Counsel argued that this caused a "chilling effect" and that the effect of this heightened security was very intrusive. ... ." (Id. at pg. 31). Petitioner also relates that a Sheriff's officer would make faces at counsel during cross-examination of a witness, that defendants would be awakened at 5:00 a.m. for a 9:00 a.m. court appearance, defendants would be

kept in their cells for 23 hours a day, defense counsel were searched before entering court, and defendants were repeatedly strip searched and otherwise mistreated.  These complaints were made known to the trial court and the court either responded cavalierly or was unmoved and refused to hold a hearing on the matter.  (Id. at pp. 31-32).  Some of the security issues affected the jury as well.  For instance, "the attorneys and some potential jurors were directed by officers to proceed through the courtroom via a path which was not the most direct to the jury box .... [T]here was no reason to do this, except to raise the concern that jurors might fear for their safety."  (Id. at pg. 32).

The security measures also impacted the defendants' right to participate in their defense.  Petitioner alleges that "the officers were not allowing defendants to bring their notes with them, ... and were required to turn their notes over to officers, to be returned the next day."  (Id. at pp. 32-33).  Moreover, some of these incidents had reached the media, further tainting the trial.  At this point, most all defense counsel requested a mistrial or at the very least, a plenary hearing to determine whether the Sheriff's officers had prejudices against defendants that caused them to conduct such "extraordinary and oppressive security measures."  The trial court declined to entertain such a hearing and denied defendants's motion for a mistrial, stating that these matters did not "go to the guilt or innocence of these defendants."  (Id. at pp. 33-34).

Counsel then lodged another complaint concerning the Sheriff's officers searching the briefcases and papers of the attorneys themselves.  In one incident, counsel was subjected to a search of his person and was required to raise his hands several times despite having passed through the metal detector. The court took no remedial action other than to say that if the files contained no metal and did not set off the metal detector, they would not be searched.  (Id. at pp. 34-35).

Finally, Petitioner argues that "[t]he trial court completely abdicated its crucial role of guarding the right of defendant to a fair trial for the sake of expediency and for, clearly, not wanting to bother itself with details of the court security which had undeniabl[y] begun to impinge on the sanctity of the judicial process.  The trial court repeatedly refused defense requests to hold a hearing on the security issue or to intervene in the security issues.  The end result was a "Kafkaesque" type of trial, one in which the pervasive "feeling" of guilt so overshadowed the defendant and overwhelmed the jury that there was absolutely no chance whatsoever of defendant receiving a fair trial."  (Id. at pg. 35).

Petitioner raised this issue on direct appeal, and the New Jersey Supreme Court issued a published opinion, holding that the heightened security measures did not deprive the defendants of a fair trial or create an unacceptable atmosphere suggestive of guilt under the standard set forth in Holbrook v. Flynn, 475 U.S. 560 (1986).  First, this Court notes that the New Jersey Supreme

Court found the following facts, which are entitled to the
presumption of correctness[3]:

> On May 22, 1995, the trial court conducted a hearing during
> which defense counsel questioned Captain Benedetto regarding
> the proposed [security] plan.... Captain Benedetto
> explained that in addition to passing through metal
> detectors located at the main entrances to the courthouse,
> all individuals entering the courtroom would be cleared each
> day by security personnel employing magnetometers (handheld
> metal detectors that resemble wands).... Additionally,
> Sheriff's officers positioned outside the courtroom would
> visually inspect any handbags, packages, or briefcases
> belonging to any person seeking entry. Security personnel
> employing those procedures would clear all persons entering
> the courtroom, including jurors, counsel, judicial staff,
> spectators, and the judge himself.
>
> Captain Benedetto explained that the heightened security
> plan was necessary because: first, the Sheriff's Office
> believed that an organized criminal group had threatened the
> lives of one or more defendants; second, there was a
> possibility that a family member of the judge, his staff, or
> the jurors might be held hostage and a family member of that
> hostage would be compelled to smuggle a weapon into the
> courtroom in exchange for the hostage's safety; and third,
> it might be possible for someone to bypass the security
> checkpoints at the two main entrances because of the large
> number of other entrances to the courthouse ...
>
> At the conclusion of the hearing, the trial court announced
> its intention to enter an order essentially codifying the
> proposed procedures.... On May 30, 1995, the trial court
> entered an order formally adopting the security plan.... In
> its cover letter to all counsel enclosing that order, the
> court noted that any party objecting to the provisions of
> the order could petition the Appellate Division for review.
> Two defendants sought leave to appeal from the order [and
> t]he Appellate Division denied that request.

---

[3] The Supreme Court has emphasized that "[f]actual
determinations by state courts are presumed correct absent clear
and convincing evidence to the contrary, § 2254(e)(1), and a
decision adjudicated on the merits in a state court and based on
a factual determination will not be overturned on factual grounds
unless objectively unreasonable in light of the evidence
presented in the state-court proceeding, § 2254(d)(2)."
Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

> The trial began on September 11, 1995, and ended on December 15, 1995.... As part of voir dire, every juror was asked the following question:
>
> The Bergen County Sheriff's Office has determined that increased security measures are necessary for this trial.... Do you understand that the security measures have nothing to do with the guilt or innocence of each defendant and should not affect your verdict in any way ... ?
>
> No cautionary instruction was given to the jury during the trial or before deliberations, and none was requested by defendants.
>
> The Sheriff's Office implemented the security plan essentially as described in the court's order.... For our purposes we will assume that the number of uniformed officers fluctuated between eighteen (the average of defendants' claims) and eleven (the average of the State's claims), depending on the day. The record is clear that one officer stood directly behind each defendant throughout trial.

State v. Zhu, et al., 165 N.J. at 549-551.

After reviewing the Holbrook standard, the New Jersey

Supreme Court:

> conclude[d] that the security plan did not pose an unacceptable risk of unfairness. Our reasons are similar to those noted by the Appellate Division:
>
> First, at no time was a finding made, or an accusation brought, that extra security measures were needed because of the conduct, character, or prior record of the defendants.... That is, the extra security was needed purportedly to protect defendants, and everyone else involved in the trial, from threats from outside parties—not to protect anyone from the defendants.... Second, all prospective jurors were asked in their questionnaires whether they understood that increased security measures, including the search of all persons entering the courtroom, had nothing to do with the guilt or innocence of defendants. Third, the patent, and unacceptable, hostility displayed towards the defense attorneys was, for the most part, out of the presence of the jury, and not in the courtroom itself.
> * * *
>
> Common experience informs us that citizens have become accustomed to the presence of security personnel in most public places, including schools .... Such common practices

44

help prevent jurors from drawing any undue inferences at the
sight of similar security measures in a courthouse setting
....

Nor do we conclude that the trial court impermissibly
delegated its responsibilities to the Sheriff ....  Because
the crimes alleged in the indictment were the product of a
violent, intra-gang rivalry capable of reaching into the
courtroom, we cannot fault the trial court for accepting
Captain Benedetto's testimony, even though additional
findings to enhance that testimony might have strengthened
the basis for the court's action.

Accordingly, we hold that the heightened security measures
in this case did not deprive defendants of a fair trial
before an impartial jury.  Even if we assume some slight
error on the part of the trial court in the manner in which
the security plan was adopted and implemented, or by the
court's failure to deliver an unsolicited cautionary charge
to reinforce the voir dire, such error was not clearly
capable of contributing to the verdict in view of the
overwhelming evidence of defendants' guilt.

Zhu, 165 N.J. at 554-56.

In Estelle v. Williams, 425 U.S. 501 (1976), the Supreme

Court stated that "the State cannot, consistently with the

Fourteenth Amendment, compel an accused to stand trial before a

jury while dressed in identifiable prison clothes, id. at 512,

"but held that the defendant in that case had waived any

objection to being tried in prison clothes by failing to object

at trial." Carey v. Musladin, 549 U.S. 70, 75 (2006).  In

Holbrook v. Flynn, six co-defendants were being tried for robbing

the Bonded Vault Co. at gunpoint, breaking into safe-deposit

boxes in the vault and escaping with four million dollars in cash

and valuables.  Throughout the course of the jury selection and

trial, a uniformed and armed state trooper sat behind each

defendant in the first spectator row.  Holbrook, 475 U.S. at 563

n. 2 (citation omitted).  After pursuing the issue on direct

45

appeal, Charles Flynn filed a § 2254 petition, which the district court denied. The First Circuit reversed, finding as follows: "[W]ith no threats shown to safety, [the trial judge] balanced nothing, but simply indicated a fear that since the defendants had not been bailed, they might flee from the courtroom. There was no evidence even suggesting any unusual likelihood of this; nor had anything whatever made 'manifest' the 'necessity for heightened security. Even if all jurors had indicated an unreserved opinion that the troopers' presence would not affect them, such expression, on a case as extreme as this, where there was no need to rely on it, is totally unacceptable." Id. at 566-67.

The Supreme Court reversed the court of appeals. First, the Supreme Court noted:

> Recognizing that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance, we have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct. To guarantee a defendant's due process rights under ordinary circumstances, our legal system has instead placed primary reliance on the adversary system and the presumption of innocence. When defense counsel vigorously represents his client's interests and the trial judge assiduously works to impress jurors with the need to presume the defendant's innocence, we have trusted that a fair result can be obtained.

> Our faith in the adversary system and in jurors' capacity to adhere to the trial judge's instructions has never been absolute, however. We have recognized that certain practices pose such a threat to the fairness of the factfinding process that they must be subjected to close judicial scrutiny ....

Holbrook, 475 U.S. at 567-68 (citations and internal quotation marks omitted).

Second, the Holbrook Court held that the conspicuous deployment of armed security personnel during trial is not the sort of "inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial." Holbrook, 475 U.S. at 568-69. Accordingly, "the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether an unacceptable risk is presented of impermissible factors coming into play." Id. at 570 (citation and internal quotation marks omitted).

Third, the Court further held that "we simply cannot find an unacceptable risk of prejudice in the spectacle of four [armed state troopers] quietly sitting in the first row of a courtroom's spectator section." Id. at 571. "We note, moreover, that even were we able to discern a slight degree of prejudice attributable to the troopers' presence at respondent's trial, sufficient cause for this level of security could be found in the State's need to maintain custody over defendants who had been denied bail after an individualized determination that their presence at trial could not otherwise be ensured. Unlike a policy requiring detained defendants to wear prison garb, the deployment of troopers was intimately related to the State's legitimate interest in maintaining custody during the proceedings and thus did not offend the Equal Protection Clause by arbitrarily

discriminating against those unable to post bail or to whom bail had been denied." Id. at 571-72. See also Deck v. Missouri, 544 U.S. 622, 629 (2005)("[T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial"); Illinois v. Allen, 397 U.S. 337, 344 (1970)(Supreme Court conceded that in extreme situations shackling and gagging of defendant may be "the fairest and most reasonable way to handle" a particularly disruptive defendant).

Fourth, the Holbrook Court clarified the limited nature of review of such a claim in a habeas petition under § 2254:

> [O]ur task here is not to determine whether it might have been feasible for the State to have employed less conspicuous security measures in the courtroom. While, in our supervisory capacity, we might express a preference that officers providing courtroom security in federal courts not be easily identifiable by jurors as guards, we are much more constrained when reviewing a constitutional challenge to a state-court proceeding. All a federal court may do in such a situation is look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over.

Holbrook, 475 U.S. at 572 (footnote omitted).

Here, Petitioner has not shown that the challenged security measures were inherently prejudicial or caused actual prejudice. See Holbrook, 475 U.S. at 572. Accordingly, this Court finds that the New Jersey Supreme Court's rejection of his Sixth and Fourteenth Amendment claim that heightened security measures violated his right to a fair trial was not contrary to, or an

unreasonable application of Holbrook or other Supreme Court

holdings.   See Sutton v. Bell, 645 F.3d 752, 756 (6th Cir. 2011)

(holding that increased security consisting of four guards behind

defense table, one next to jury, two in balcony, and one at each

of courtroom's three doors in trial of three inmates for

violently murdering an inmate was not unconstitutional under

Holbrook).   Therefore, habeas relief is not warranted on

Petitioner's Ground Three.

D.   Jury Charge on Accomplice Liability

In Ground Four, Petitioner argues that the trial court's

accomplice liability instruction failed to convey to the jury

that in any or all of the offenses charged, the accomplice could

be found guilty to a lesser degree than the principal, based on

the accomplice's own mental state.   Thus, this allegedly

erroneous accomplice charge undermined the prosecutor's burden to

prove guilt beyond a reasonable doubt, and rendered Petitioner's

trial fundamentally unfair in violation of his right to a fair

trial and due process guaranteed under the Sixth and Fourteenth

Amendments.

Petitioner and other co-defendants raised this claim on

direct appeal.   The Appellate Division rejected the claim without

discussion.   See State v. Lin, Docket No. A-5073-95T4 slip op. at

4 & 6 ("We are satisfied that defendants received as fair a trial

as they could, under the circumstances.   We are also satisfied

that the convictions were based upon overwhelming evidence of

defendants' guilt.   While, therefore, there may have been some

49

trial errors, none of them are such as to require reversal.  We have carefully examined all of the numerous contentions raised by counsel and pro se defendants in light of the entire record and applicable law and are convinced all but three issues require no further opinion.").

Generally, a jury instruction that is inconsistent with state law does not merit federal habeas relief.  Where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding,

> [t]he only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record.  In addition, in reviewing an ambiguous instruction ..., we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.  And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly."  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73 (1991) (citations omitted); see also Smith v. Spisak, ___ U.S. ___, 130 S.Ct. 676, 684 (2010)(no right to habeas relief if Supreme Court has not previously held jury instruction unconstitutional for same reason); Waddington v. Sauausad, 555 U.S. 179 (2009).

The United States Court of Appeals for the Third Circuit has observed that a habeas petitioner who challenges state jury instructions must "point to a federal requirement that jury instructions ... must include particular provisions," or

demonstrate that the jury "instructions deprived him of a defense which federal law provided to him."  <u>Johnson v. Rosemeyer</u>, 117 F.3d 104, 110 (3d Cir. 1997).  This is because district courts do not "sit as super state supreme courts for the purpose of determining whether jury instructions were correct under state law with respect to the elements of an offense and defenses to it."  <u>Id</u>.  As the Third Circuit explained,

> In considering whether this case involves a claim of error under the Constitution, laws, or treaties of the United States, it is critical to remember that the Supreme Court has made it clear that the states define the elements of state offenses.  Accordingly, while there may be constitutionally required minimum criteria which must be met for conduct to constitute a state criminal offense, in general there is no constitutional reason why a state offense must include particular elements.  <u>See</u> <u>McMillan v. Pennsylvania</u>, 477 U.S. 79, 84-86, 106 S.Ct. 2411, 2415-16, 91 L.Ed.2d 67 (1986).

> It thus follows that for the error of state law in the justification instructions, assuming that there was an error, to be meaningful in this federal habeas corpus action, there would have to be a body of federal law justifying the use of deadly force which is applicable in a state criminal action charging an offense based on the defendant's use of that force.  Then the error in the jury instructions would be significant if the instructions did not satisfy that body of law.  Put in a different way, the jury instructions on justification, even if correct under state law, would need to have relieved the state of the necessity of proving an element of the offense as required by federal law or to have deprived the petitioner of a defense the state had to afford him under federal law in order to be significant in a federal habeas corpus action.  If we concluded that a petitioner could obtain habeas corpus relief without making such a showing, then district courts in habeas corpus cases would sit as super state supreme courts for the purpose of determining whether jury instructions were correct under state law with respect to the elements of an offense and defenses to it.

<u>Johnson</u>, 117 F.3d at 110.

However, a jury instruction that "reduce[s] the level of proof necessary for the Government to carry its burden [of proof beyond a reasonable doubt] is plainly inconsistent with the constitutionally rooted presumption of innocence."  Cool v. United States, 409 U.S. 100, 104 (1972).  See also In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); Sandstrom v. Montana, 442 U.S. 510, 523 (1979) (jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused); Smith v. Horn, 120 F.3d 400, 416 (1997), cert. denied, 522 U.S. 1109 (1998)(the Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law.").

"[T]rial courts must avoid defining reasonable doubt so as to lead the jury to convict on a lesser showing than due process requires."  Victor v. Nebraska, 511 U.S. 1, 22 (1994).  As the Supreme Court explained in Victor, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof.  Rather, taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury.  Victor, 511 U.S. at 6 (citations and internal

quotation marks omitted).   "[A] misdescription of the burden of proof ... vitiates *all* the jury's findings.   Sullivan v. Louisiana, 508 U.S. 275, 281 (1993) (emphasis in original).   Such an error is considered structural and thus is not subject to harmless error review.   See id. at 280-82.   But see Neder v. United States, 527 U.S. 1, 8-11 (1999) (applying harmless-error analysis where jury was not instructed on an element of an offense).

In this case, the Appellate Division found no error with respect to the jury charge on accomplice liability sufficient to warrant any discussion in its opinion.   This Court has carefully reviewed the jury instructions as a whole, as well as the instruction on accomplice liability, and finds no error of constitutional dimension in this case.   Further, any deficiencies in the jury instructions were simply harmless error and were not capable of producing an unjust result.   See Williams v. Beard, 637 F.3d 195, 223 (3d Cir. 2011)("[E]ven if the trial court's accomplice liability charge was in some respect ambiguous, there is no reasonable likelihood that the jury applied the instruction in a manner that relieved the Commonwealth of its burden of proof with respect to first degree murder.").   Indeed, given the overwhelming circumstantial evidence presented at trial against Petitioner in this case, as set forth in the State's response to this petition (Docket entry no. 12 at pp. 35-37), and as set forth in the state courts' rendition of the facts presented in Section I.B of this Opinion, supra, at pp. 5-10, the trial

court's charge to the jury on accomplice liability was proper and did not have the capacity to affect the verdict in any substantial or injurious way or prejudice Petitioner in any way. See Brecht v. Abrahamson, 507 U.S. at 637-38.

Finally, this Court concludes that the jury instruction was not plain error because the trial judge clearly instructed the jury about the State's burden of proof as to each offense and the elements for each offense and the elements for accomplice liability.  In short, the jury instructions did nothing "to lift the burden of proof on an essential element of an offense." Therefore, having carefully reviewed the jury charges as a whole, this Court finds that Petitioner was not deprived of a fair trial by the overall jury instructions given, and any error as asserted by Petitioner in this regard was, at the very most, plainly harmless in light of the overall record.  Moreover, the Appellate Division's rejection of Petitioner's claim was not contrary to, or an unreasonable application of, Supreme Court precedent. Accordingly, Petitioner is not entitled to habeas relief on this claim.

E.  Due Process—Prosecutorial Misconduct

In Ground Five, Petitioner argues that the prosecutor's use of perjured testimony and suppression of favorable evidence violated his rights to a fair trial and due process in violation of the Sixth and Fourteenth Amendments.

For instance, Petitioner alleges that the prosecutor failed to provide the agreements entered between the authorities and

four of the State's witnesses, namely, Alan Tam, Henry Tu, Cheng Liang Lin, and Ming Cheng a/k/a Ah Mee Liu.  Petitioner claims that withholding of these agreements deprived him of material impeachment evidence, thus violating his right to a fair trial and due process.

Petitioner also contends that the prosecutor allowed witness Ming Cheng to give perjured testimony that was extremely prejudicial to the defense and likely caused the jury to convict. At trial, Cheng testified that he and the victims were unarmed, supporting the State's case that the killings were unprovoked. However, in Cheng's statement made to Sgt. Trahey of the Teaneck Police Department, Cheng gave police an account that the victims were heavily armed with various handguns and may have actually initiated the violence.  This information was contained in Detective Danyo's application for a search warrant in which Danyo relates that he was informed by Sgt. Trahey of Cheng's statement. Petitioner argues that Ming Cheng's statement to Sgt. Trahey [as recounted in Detective Danyo's application for a search warrant] "defeats the prosecutor's case-in-chief and would have completely changed the way the jury would have contemplated the culpability of the defendant.  The jury never heard evidence that the victims were heavily armed with various handguns and actually initiated the violence."  (Petition at pg. 46).

It also would appear that Petitioner is alleging that the prosecutor presented false testimony from State witnesses Tu and Tam when these witnesses testified that the federal government

had not promised any sentence reduction in exchange for their
testimony against defendants.  However, both Tam and Tu
ultimately received substantially reduced sentences because of
the substantial assistance that they gave to the government in
testifying at Petitioner's trial.  At the time they pled guilty,
Tam and Tu were facing a life sentence in prison.  However, Tam
served four years in prison, and Tu served a six year custodial
term.  (Id.).

This issue was raised on direct appeal.   In its opinion,
the Appellate Division found that the state presented

> testimony from four Fuk Ching gang members, one of whom was
> a victim and another who was present at the scene.  The
> testimony of these witnesses was, to an extent, effectively
> impeached by defense counsel.  But the State's case also
> included other inculpatory evidence obtained from the crime
> scene, the vehicles used and a Brooklyn apartment where the
> crimes were planned.  The evidence included impartial
> witness accounts and physical evidence directly connecting
> defendants to the crimes.

State v. Lin, Docket No. A-5073-95T4 slip op. at 7.

Petitioner also raised this issue in his state PCR petition
(after Tu and Tam had been sentenced in federal court). The PCR
court rejected the claim as follows:

> One issue raised by a number of-presumably by all but not
> argued by all, concerning Mr. Tam and Mr. Tu, who testified
> with regard thereto, and this issue was really raised at the
> Appellate Division [on direct appeal] on page seven.  The
> State's evidence included testimony from four Fuk Ching gang
> members and one of whom was a victim, another who was
> present at the scene.  The testimony of these witnesses of
> which I include Tam and Tu, although not mentioned [by
> name], was to the extent effectively impeached by
> defendants' counsel.
>
> So, I mean, certainly this issue was raised by the Appellate
> Division, discussed as to the impact of Mr. Tam an[d] Mr.
> Tu, and I think at the time Mr. Tam, Mr. Tu had not resolved

all of their cases, were testifying in other proceedings in other courts not in New Jersey, not related—may be related to this but not part of this matter.

So, certainly with regard to that, the fact that someone faces twenty-five years to life, perhaps, and then they receive less, is well examined and explored by defense counsel, and as I recall, Mr. Tam and Mr. Tu were never treated with too much respect by defense counsel, and because they wanted to make sure it was shown that they were making a deal and that that's really why they were testifying.

(November 21, 2005 PCRT 82:23-83:22).

On appeal from the denial of the PCR petitions, the

Appellate Division described the testimony of witnesses Tam and

Tu as follows:

Alan Tam, one of the main witnesses against defendants, was a member of the Fuk Ching. He pled guilty in federal court to charges related to the killings and agreed to testify at this trial. Alan Tam testified that in early April 1993, he spent several days at an apartment in Brooklyn where Simon Lau, Chao Lin Feng, and Jeffrey Zhu attempted to recruit him to participate in the murder of Ah Wong. The motivation behind this plot was to gain control of the alien smuggling business and to strike back for the attempted killing of Xin Dan Lin. Alan Tam met with Ah Wong four days before the killing. He did not warn Ah Wong of the murder plot against him.

Tu Wei Chung was also a member of the Fuk Ching gang. Like Tam, he testified for the State pursuant to a plea agreement on federal charges. He corroborated Tam's testimony.

State v. Lin, 2010 WL 1330272 at *2.

In Napue v. People of State of Ill., 360 U.S. 264 (1959),

the Supreme Court held that due process is violated when "false

testimony used by the State in securing the conviction ... may

have had an effect on the outcome of the trial." Id. at 272.

"The jury's estimate of the truthfulness and reliability of a

given witness may well be determinative of guilt or innocence,

and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." United States v. Bagley, 473 U.S. 667, 676 (1985)(quoting Napue, 360 U.S. at 269)). However, "[a] finding of materiality of the evidence is required.... A new trial is required if the false testimony could ... in any reasonable likelihood have affected the judgment of the jury ..." Giglio v. United States, 405 U.S. 150, 154 (1972)(citations and internal quotation marks omitted). Thus, in United States v. Bagley, 473 U.S. 667, 677 (1985), the Supreme Court "noted the well-established rule that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Id. at 677 (citations and internal quotation marks omitted); accord Smith v. Phillips, 455 U.S. 209, 219 n. 10 (1982)("Even in cases of egregious prosecutorial misconduct, such as the knowing use of perjured testimony, we have required a new trial only when the tainted evidence was material to the case").

Here, there was no due process violation based on the use of perjured testimony or any unreasonable application of Supreme Court holdings.  First, there was significant circumstantial evidence and other witness testimony linking Petitioner to the crimes (for instance, Petitioner was present in the van seen fleeing the crime scene, DNA tests of the blood on Petitioner's shirt was linked to victim Liang Qun Guo, and witness testimony

placing Petitioner in the house).  Thus, the allegedly false
testimony of Ming Cheng concerning the victims not having
weapons, was not material to Petitioner's guilt or the fairness
of his trial.

Second, Petitioner has not shown that witnesses Tu and Tam
testified falsely when they testified that there was no promise
of leniency made to them in exchange for their testimony.
Moreover, given that defense counsel impeached Tam and Tu, in
part, because they had each made deals, the allegedly false
testimony of Tam and Tu that they received no promise of
leniency, was not material to Petitioner's guilt or the fairness
of his trial.  Accordingly, Petitioner is not entitled to habeas
relief on his use of perjured testimony claims.  See Prosdocimo
v. Secretary, Pa. Dept. of Correc., 2012 WL 120102 (3d Cir.
Jan.17, 2012); Lambert v. Blackwell, 387 F.3d 210, 242 (3d Cir.
2004).

Petitioner also contends that the prosecution improperly
suppressed or altered police evidence in violation of his rights
under Brady v. Maryland, 373 U.S. 83 (1963 ).  In particular,
Petitioner alleges that during the cross-examination of Detective
Cox, it was learned that he had prepared two separate police
reports.  In one report, it was stated that a bullet was found on
the person of Xin Dan Lin, and in the other report, it was stated
that the bullet was found on another co-defendant.  Petitioner
complains that this previously undisclosed information was a
crucial issue in the trial.  The Appellate Division had rejected

all <u>Brady</u> claims without discussion. <u>See</u> <u>State v. Zhu</u>, Docket No. A-4025-95T4 slip op. at 4 & 6 ("We are satisfied that defendants received as fair a trial as they could, under the circumstances. We are also satisfied that the convictions were based upon overwhelming evidence of defendants' guilt. While, therefore, there may have been some trial errors, none of them are such as to require reversal. We have carefully examined all of the numerous contentions raised by counsel and pro se defendants in light of the entire record and applicable law and are convinced all but three issues require no further opinion.").

The Supreme Court has held that the prosecution in a criminal proceeding has a due process obligation to disclose to the defendant its knowledge of material evidence favorable to the defendant, either because the evidence is exculpatory or because it can serve to impeach a key prosecution witness. <u>See</u> <u>Kyles v. Whitley</u>, 514 U.S. 419, 433 (1995); <u>Giglio v. United States</u>, 405 U.S. 150 (1972); <u>Brady v. Maryland</u>, 373 U.S. 83 (1967). Supreme Court precedent clarifies that "[t]here are three components of a true <u>Brady</u> violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable

probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. at 682; see also California v. Trombetta, 467 U.S. 479, 488-89 (1984)(state's failure to retain breath samples was not unconstitutional where the chances are extremely low that preserved samples would have been exculpatory).

In this case, this Court has examined the state court record, and concludes that Petitioner has not demonstrated a non-disclosure in violation of Brady v. Maryland.  First, this tardy disclosure of the two reports occurred during trial and was not too late so as to cause prejudice to Petitioner.  See United States v. Word, 806 F.2d 658, 665 (6th Cir. 1986).

Moreover, the alleged Brady evidence, the 9mm bullet found in Xin Dan Lin's pocket, was known in advance of trial, and clearly was not exculpatory.  Further, regardless of which co-defendant's pocket the bullet was allegedly found - the point of surprise Petitioner asserts is that the other undisclosed report stated the bullet was found in the pocket of another co-defendant - such information was not exculpatory because it still linked one of Petitioner's co-conspirators (and co-defendants) and fellow occupants in the van to the scene of the crime.  And, as noted by the trial court, this discovery blunder provided defense counsel fodder for cross-examination.  (October 3, 1995 Trial Transcript 81:10-21).

Further, with respect to the plea agreements between the federal authorities and witnesses Tu and Tam, it appears from the

record that defense counsel had received federal documents
relating to these agreements, such as federal "5K letters" and
plea transcripts.  Moreover, as discussed above, defense counsel
effectively impeached these witnesses regarding the lenient plea
arrangements.  Thus, Petitioner has not shown that the outcome of
the proceeding would have been different had he had the benefit
of the allegedly suppressed impeaching evidence.  And since the
Appellate Division's rejection of the claim on the ground that
the alleged nondisclosure did not undermine confidence in the
outcome of the proceeding, the Appellate Division's adjudication
of the claim was not contrary to, or an unreasonable application
of Supreme Court holdings.

F.   Ineffective Assistance of Counsel Claims

     In Grounds Six and Seven of his petition, Petitioner argues
that counsel was constitutionally ineffective.  In particular, in
Ground Six, Petitioner argues that counsel "failed to exercise
Petitioner's six remaining peremptory challenges to strike jurors
Donna Rakowski, Elaine O'Brian and Alma Reavis which resulted in
biased jurors on Petitioner's jury."  (Petitioner's Brief at pp.
86-93, Docket entry no. 1-1).  In Ground Seven, Petitioner argues
that (a) counsel failed to introduce the exculpatory statement in
Detective Danyo's affidavit for a search warrant regarding
possession of guns by the victims, (b) counsel failed to correct
the prosecutor's erroneous statements regarding accomplice
liability resulting in an erroneous instruction to the jury, (c)
counsel failed to exercise peremptory challenges of biased jurors

(repetitive of Ground Six), (d) the conduct of the sheriff's officers violated Petitioner's right to effective assistance of counsel by inducing and directly contributing to many of the trial counsel errors, (e) counsel failed to interview and adequately impeach the testimony of Allan Tam and Henry Tu; (f) the trial court's preclusion of side bar conferences contributed to counsel's ineffectiveness, (g) counsel failed to impeach testimony of Chang Liang Lin despite availability of evidence contrary to the witness's testimony, (h) counsel failed to adequately investigate the case, and (i) counsel failed to obtain and present an expert witness on Chinese alien smuggling and Chinese gangs.

The Sixth Amendment, applicable to states through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right ... to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance. See Strickland v. Washington, 466 U.S. 668, 686 (1984). The "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), is the standard for ineffective assistance of counsel as enunciated in Strickland.

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied. See Strickland, 466 U.S. at 687.

First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness," assessing the facts of the case at the time of counsel's conduct.  See id. at 688-89; Jacobs v. Horn, 395 F.3d 92, 102 (3d Cir. 2005); Keller v. Larkins, 251 F.3d 408, 418 (3d Cir.), cert. denied, 534 U.S. 973 (2001).  To meet this first prong, a "convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  Id. at 690.  The court must then determine whether, in light of all the circumstances at the time, the identified errors were so serious that they were outside the wide range of professionally competent assistance.  Id.  In analyzing alleged deficient performance, a court "begin[s] with the premise that 'under the circumstances, the challenged action[s] might be considered sound trial strategy,'" Cullen v. Pinholster, ___ U.S. ___, 131 S.Ct. 1388, 1404 (Apr. 4, 2011)(quoting Strickland at 689).  A court "'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'"  Cullen, 131 S .Ct. at 1407 (quoting Strickland at 689-90).

If able to demonstrate deficient performance by counsel, then the petitioner must show prejudice, i.e., there is a "reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  As the Strickland Court explained, "[a]ttorney

64

errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial." Id. at 693. Thus, the Court held that prejudice is shown if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. The reviewing court must evaluate the effect of any errors in light of the totality of the evidence. See id. at 695-96.

> As the Supreme Court explained,
>
> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

Strickland, 466 U.S. at 695-696.

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct *so undermined* the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Cullen, 131 S.Ct. at 1403 (quoting Strickland, 466 U.S. at 686 (emphasis in Cullen). Thus,

habeas review of a state court's adjudication of an ineffective assistance claim is "doubly deferential." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009). To obtain habeas relief, a state petitioner "must demonstrate that it was necessarily unreasonable for the [state c]ourt to conclude: (1) that [petitioner] had not overcome the strong presumption of competence; and (2) that he failed to undermine confidence in the [outcome]." Cullen, 131 S.Ct. at 1403. In other words, the petitioner must establish both deficient performance and resulting prejudice in order to state an ineffective assistance of counsel claim. See Strickland at 697; see also Jacobs, 395 F.3d at 102; Keller, 251 F.3d at 418. However, the Supreme Court further instructed that a district court need not address both components of an ineffective assistance claim "if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id.

In the instant case, Petitioner presented his ineffective assistance of counsel claims in his petition for post-conviction relief. The PCR court rejected the claims, primarily because defendants did not show prejudice, and the Appellate Division affirmed on this basis:

> At the outset, we note that the State had a strong case. There were two eyewitnesses to the massacre: Lin Ling Chan and Ming Cheng. They were both familiar with all defendants. Identity was not an issue. In addition, Alan Tam and [Tu] Wai Chung, who had prior knowledge of the conspiracy, testified for the State. Against this

background, defense counsel had little proof of arguments to counter the evidence against defendants.  From our careful review of the record, we note that counsel vigorously participated in the trial, cross-examining witnesses and making arguments on behalf of their clients.  Moreover, there was ample evidence of defendants' guilt.
* * *
It is well-settled that when arguing that counsel failed to conduct a pre-trial investigation or interview witnesses a defendant must do more than make bald assertions of denial of the effective assistance of counsel.  When a defendant alleges that his or her attorney inadequately investigated the case, the defendant must assert facts that an investigation would have revealed, supported by affidavits or certifications based upon the personal knowledge of the affiant or the person making the certification....
Here, [defendant] has not presented an affidavit or certification to support his assertions ...
* * *
In sum, following the Strickland/Fritz standard, our review of the record does not disclose any deficiency by any of the trial, appellate, or PCR counsels.  Further, there is overwhelming evidence that defendants committed the crimes of which they were convicted.  Moreover, even if we assumed that, in some respects, defense counsel's representation of any of the defendants was deficient, defendants failed to establish the defendants would have been found not guilty of the charges [i]f their attorneys had handled the matter differently.

State v. Lin, 2010 WL 1330272 *4, *5, *10 (N.J.Super.Ct.App.Div., Apr.6, 2010)(citations and internal quotation marks omitted).

Given the overwhelming evidence of guilt, this Court finds that the New Jersey courts' rejection of Petitioner's ineffective assistance claims for failure to show prejudice was not contrary to, or an unreasonable application of Strickland and its progeny.

Nevertheless, as to the individual claims asserted here, this Court also readily finds no deficient performance sufficient to merit to Petitioner's contentions.  As set forth above in this Opinion, this Court found no constitutional violation with respect to Petitioner's jury claims.  Thus, his claim concerning

counsel's failure to use peremptory challenges likewise fails. See DeLozier v. Sirmons, 531 F.3d 1306, 1323 (10th Cir. 2008)("Generally, an attorney's actions during voir dire are considered to be matters of trial strategy, which cannot be the basis of an ineffective assistance claim unless counsel's decision is so ill chosen that it permeates the entire trial with obvious unfairness"); Gardner v. Ozmint, 511 F.3d 420, 425-26 (4th Cir. 2007)(noting that "[o]n habeas review, federal courts generally accord particular deference to the judgment of trial counsel during voir dire, state court's determination that counsel's failure to use a peremptory challenge on allegedly biased juror was tactical did not warrant habeas relief) (citation omitted).  Thus, Petitioner is not entitled to habeas relief on his ineffective assistance of counsel claims respecting the jury selection process and failure to exercise peremptory challenges.  (See also this Opinion, supra, at Section IV.A).

As to the claims regarding counsel's failure to introduce the statement made by witness Meng in his statement to Detective Danyo, and counsel's failure to investigate and adequately impeach witnesses Tu, Tam, and Cheng, the underlying issues were adjudicated on the merits consistent with Supreme Court precedent and were found to be wholly lacking in merit.  See this Court's Opinion at Section IV.E above.  There was simply no demonstration of deficient performance by counsel on these claims that would have had any effect of undermining the verdict.  Indeed, this Court notes that Petitioner has not shown by any competent

evidence that his counsel did not attempt to interview theses witnesses, and even so, it is highly improbable that counsel for the witnesses would have allowed such interviews given that any such interviews could have impacted the alleged agreements made between the federal authorities and the witnesses on federal charges that were still pending at the time of trial proceedings. Moreover, as discussed previously, defense counsel had sufficient information about the plea deals to adequately impeach these witnesses at trial.

As to the use of Detective Danyo's affidavit, because Danyo related what Investigator Trahey had reported from another investigator's comments after speaking with Cheng Meng, such report or affidavit would have been impermissible hearsay. Moreover, Meng admitted during his testimony at trial that he made such statements to the police immediately after the crimes, but contended that his statements were false at that time due to fear, anger and poor translation.  (October 23, 1995 Trial Transcript 134:1-137:8; October 25, 1995 Trial Transcript 27:2-34:25; and October 26, 1995 Trial Transcript 92:11-94:1). Therefore, this Court finds no deficient performance by counsel and no resulting prejudice with respect to these claims.

This Court also finds no basis for Petitioner's claim that counsel failed to impeach Chang Liang Lin's testimony.  At trial this witness had identified Petitioner as being present in the house, and specifically, identified Petitioner as the individual who had covered him with a blanket while he was tied up in the

basement.  Chang Liang Lin also stated that he had first seen Petitioner back in his hometown in China.  However, Petitioner argues that prior to trial, the witness had never identified Petitioner as being present at the crime scene despite numerous opportunities to do so.  On three separate occasions, on September 14, 1993, April 6, 1994, and July 13, 1995, Chang Liang Lin was shown photo arrays that included Petitioner and failed to identify him.  Also, on August 3, 1995, during a <u>Wade</u> hearing pretrial, Mr. Lin never identified Petitioner as being present at the crime scene.  Petitioner argues that counsel was deficient in failing to impeach Mr. Lin's testimony based on the prior failures to identify Petitioner.

Petitioner's claim overstates and overlooks the impact of Chang Liang Lin's identification testimony.  First, there was other undisputed evidence that placed Petitioner in the basement of the house at the crime scene.[4]  Second, Petitioner's counsel was spared the task of impeaching Mr. Lin, a neurologically impaired and sympathetic witness, on cross-examination, by the trial judge's curative instructions to the jury concerning Mr. Lin's identification testimony.  Indeed, the judge's charge to the jury emphasized that (1) Mr. Lin had not identified Petitioner at any prior court proceeding; (2) Mr. Lin had not identified Petitioner in any previous phot arrays, one of which

---

[4]  This evidence was the presence of victim Liang Qun Guo's blood on Petitioner's jacket.  Guo was murdered in the basement, thus the DNA match of the blood on Petitioner's jacket to Guo places Petitioner in the basement to a near certainty.

included a blow-up of Petitioner; and (3) the jurors should not give great weight to mr. Lin's in-court identification, but rather should consider it with "great caution."  (November 16, 1995 Trial Transcript at 20:18-21:9).  This curative instruction was reiterated in the court's final charge to the jury. (December 11, 1995 Trial Transcript at 24;1-15).  Accordingly, this Court finds no deficient performance by counsel and no resulting prejudice with respect to this claim.

Petitioner next argues that his counsel was deficient in failing to object to the prosecutor's allegedly erroneous statements concerning accomplice liability that resulted in an allegedly erroneous jury charge.  The underlying claim was found to be without merit as discussed above in Section IV.D. Accordingly, where there is no constitutional violation regarding the accomplice liability jury instruction, this Court finds no merit to Petitioner's claim of ineffective assistance of counsel on this particular claim.

Petitioner's argument that his counsel was ineffective due to the security measures affecting his counsel's performance is completely unsubstantiated.  Petitioner fails to identify counsel's specific deficiencies in this regard and further cannot demonstrate prejudice, especially in light of the overwhelming evidence of his guilt at trial.

Next, Petitioner alleges that the trial court's preclusion of side bar conferences contributed to counsel's ineffectiveness. The PCR court rejected this claim, noting that there was about

71

four sidebar conferences during trial, and that "the reason for that was with six defendants, they were held outside in the hallway, because there was no room in the courtroom to get six counsel together and not be outside the hearing of the jury." (November 21, 2005 PCRT at 84:4-10). Again, Petitioner's failure to identify counsel's specific deficiencies in this regard does not demonstrate any resulting prejudice to Petitioner at trial, especially in light of the overwhelming evidence of his guilt at trial.

Finally, Petitioner also claims that counsel failed to adequately investigate the case, or obtain an expert in Chinese alien smuggling and Chinese gang culture, resulting in an incomplete defense. Specifically, Petitioner alleges that had counsel adequately investigated and obtained an expert, it would have shown that Petitioner was not a gang member, but rather an illegal alien coerced into participating by virtue of his need for protection. The PCR court rejected this claim as follows:

> In regard thereto, certainly what went on with illegal immigrants was fully explored here, and ... just after having tried the case unsuccessfully, to then raise a whole different issue, because at no time was there a willingness upon Cho Lee Lin to come and testify as to what had taken place, and I think all of the defendants had no desire to testify and be subject to cross-examination, that there is really no basis for that. I don't know what an expert in Chinese culture would tell you. I guess they would have to deal with the Chinese criminal culture with regard to importation of illegal immigrants, and how that would affect any result in this case, I can't see, ... .

> I think this case is best summed up on page six of the Appellate Division when it says, "The State's evidence overwhelmingly established that the defendants planned the murders in retaliation for the earlier murders of the friends of one of the defendants, Xin Dan Lin, (2) and in an

72

effort to obtain leadership of the gang and its lucrative
participation in the illegal smuggling of Chinese aliens.".

I think with regard thereto, that ineffective assistance of
counsel would not be related to hiring an expert in Chinese
culture or talk about this defendant being a slave of the
gang.  I think the evidence was there, and it was clear and
overwhelming that he participated willingly in what was
taking place.  Maybe he was trying to get away from the
Snake Heads in order to become a part of this gang and
receive more lucrative remuneration, but there is no purpose
or function with regard to ineffective assistance of counsel
in hiring an expert in Chinese culture. ... And I don't
think there is any desire on [defendants'] part at any time
to participate in such a program or plan.

(November 21, 2005 PCRT 84:14-86:6, 97:4-7).

Based on all of the above, and on the overwhelming evidence
of Petitioner's guilt at trial, this Court concludes that the
determination of the state PCR court and appellate court in
finding no constitutionally ineffectiveness of counsel, resulted
in a decision that was neither contrary to, nor involved an
unreasonable application of clearly established federal law under
Strickland, nor did it result in a decision that was based on an
unreasonable determination of the facts in light of the evidence
presented in the state court proceeding.  Williams v. Taylor,
supra.  Petitioner has failed to demonstrate that the state court
opinions, when evaluated objectively and on the merits, resulted
in an outcome that cannot be reasonably justified.  Matteo, 171
F.3d at 891.  Therefore, the Court will deny federal habeas
relief on theses ineffective assistance of counsel claims because
they are substantively meritless.

V.   CERTIFICATE OF APPEALABILITY

This Court next must determine whether a certificate of appealability should issue.  See Third Circuit Local Appellate Rule 22.2.  The Court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  For the reasons discussed above, this Court's review of the claims advanced by petitioner demonstrates that he has failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue.  Thus, this Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

## CONCLUSION

For the above reasons, this Court finds that the § 2254 habeas petition must be denied, and a certificate of appealability will not issue.   An appropriate Order follows.


DENNIS M. CAVANAUGH
United States District Judge

DATED: 8/1/12

74